Thank you, your honor. May it please the court. Claire Murray on behalf of the United States. This is a case about deference to the Supreme Court and to Congress. The question presented in this case has already been decided by the Supreme Court of the United States. In Ross Kirby Goldberg, the Supreme Court held, quote, Congress acted well within its constitutional authority when it authorized the registration of men and not women under the Military Selective All right, but when they held that, you know, they go into some detail that at the time women were prohibited from combat, and that seemed to be sort of a rallying point in the majority. Of course, there are vigorous dissents by Justice Marshall and others, as I recall, in the case, but seemed to be a seminal point about women prohibited from combat and some other factors as maybe making a difference in terms of the way the court came out. So having been said, having said that, assuming that was correct, is that such a difference, i.e. that, of course, now women are not prohibited from combat, etc., etc. So in other words, Ross definitely says what but is the fact, the reality of women in combat and everywhere else, you know, within certain, is that a factor that allows distinguishing? I mean, I know what the Supreme Court says about it. It's their job to decide what doesn't apply and so forth, but undeniably, the court spent a lot of time on the women prohibited from combat, etc. You see where I'm going, and there's vigorous dissents. So since you lead off with Ross, it just helped me understand, is that a meaningful difference, or it's just a fact in the analysis, but doesn't mean that Ross did that. It's a long way to ask a question. The fact that one of the Supreme Court's justifications has changed does not mean that its holding has changed. So by its very terms here, we have the same claims, the same claim, which is a due process claim sounding in equal protection. We have the same statute, the Military Selective Service Act. None of that has changed, and by its terms, the question presented in Rosker is the same as the question presented here, and the court's holding is the same. Now, it's true that one of the court's justifications, maybe its main justification, has changed, but the Supreme Court has been very clear that when an underlying justification changes, only the Supreme Court has the, quote, prerogative of overruling its own decisions. That's Rodriguez de Quijas. And that's true even where here, whereas here, the underlying justification that has changed is not a bit of case law, but it's a fact. And so for that proposition, I would turn the court to State Oil v. Khan, which is an antitrust case, where the court switched from a per se rule to a rule of reason, overruling a prior case, and it looked at, quote, changes in economic realities and changed circumstances and the lessons of accumulated experience, in part. And nonetheless, what it did was praise the lower court for applying its previous precedent rather than overruling its previous precedent. And that's... And how many years has Congress had since women were allowed in combat and have done nothing? So women have been fully integrated into combat units or allowed to join all combat units since January of 2016. But I wouldn't say that... I'm sorry. Excuse me. So since January of 2016. And so that's been four years. But I wouldn't say that Congress has done nothing. Congress has done two important things. First, Congress almost changed the law. So Congress went through the amendment process within the National Defense Authorization Act and came close to admitting women... It almost did something. It almost did something. But then in lieu of that almost doing something, what it did was it established a commission. So two and a half years ago, it established a commission to study this question. That commission is due to produce its report to Congress this month. It has been charged with doing hearings and listening sessions and talking to the... Is it in fact going to submit it this month? This is outside the record, Your Honor. But yes, the commission has announced a few days ago that the report would come out March 25th. And presumably what that will do is kick off the same process that Congress went through in 1980, which was the last time there was a sort of big change in circumstances, which is to have floor debates and hearings and committee debates. And it would really short circuit that entire process for this court to get ahead of that process and hold that it is unconstitutional for Congress to maintain the status quo while it deliberates about this question. Even if Rosker doesn't control, which we think it does, but even if Rosker doesn't control, it is very clear about the fact that judicial review in the military sphere is extremely deferential. This is the context where Rosker said judicial deference should be at its apogee. Rosker obviously resists putting a label, a tier of scrutiny, on the level of analysis it requires, but its analysis is interesting in three respects. So first, Rosker looks not just at Congress's express justifications, but also to what Congress may quite rationally have believed. That's the Schlesinger formulation. And obviously that's not something you see in an intermediate scrutiny context. And Rosker embodies that. So the court in Rosker looks not just to the justifications that Congress put forth in 1948 when it passed the Military Selective Service Act, but also to what Congress did in 1980. Second, Rosker makes clear that courts may take into account administrative problems. It says, it's not for this court to dismiss such problems as insignificant in the context of military preparedness and the exigencies of a future mobilization. That's not something that occurs in an intermediate scrutiny context, as we know from Craig v. Boren, but it is something that the court can look at here. And third, Rosker makes clear that Congress is not required to do the same level of close tailoring between means and ends that it would be required to do in an intermediate scrutiny context. So probably the clearest illustration of this is the Goldman v. Weinberger case, which is a case where an Orthodox rabbi who was a clinical psychologist on a military base wanted to wear a yarmulke. This is a pre-employment division versus Smith case, so strict scrutiny applies. We're effectively in a RFRA world at this point. And nonetheless, the court is unmoved in that case by the fact that the government is unable to produce any studies showing that there will be harm to military esprit de corps from yarmulke wearing, whereas Mr. Goldman has a number of studies. They're unmoved by the fact that the government doesn't look at making exceptions for Mr. Goldman. And Rosker is the same way. So in Rosker, the court is not swayed by the fact that there were, at that point, 80,000 non-combat positions that could have been filled by women even before women were admitted to combat. And if you apply those sort of three aspects to the deferential review here, it's clear that the male-only registration requirement survives constitutional muster. So Rosker itself, we look at means and ends. So in terms of ends, Rosker itself found that the government's in raising and supporting armies qualified as a, quote, important interest. So even under that higher intermediate scrutiny standard, Congress's end is important enough. So then the question for us is just whether Congress may quite rationally have believed the government's interest would be served by the male-only draft requirement, or at least by maintaining the status quo while Congress studied the issue, which, as we've discussed, it's doing right now. And my friend's position is that there's no way that Congress could rationally have believed that its ends would be best served by this position. And we think there are several reasons why that's not true. So just stepping back, the point of a draft is to quickly raise a lethal force to defend the country in an emergency. The National Defense Authorization Act says that the draft is for replacement combat troops. So it's for times when the front lines have fallen and we need new front line soldiers. Given the physical differences between men and women, my friend has not shown that Congress could not have rationally believed that a randomly selected pool of women would be less likely, on average, to produce the same number of combat-ready troops that a randomly selected pool of men would have. And that is alluded to in DOD's 2017 report in the record. Secretary Carter's implementation memo for integration of women into the service cites another reason, which is that Marine and Army studies show that women in combat are more likely to sustain injuries than are men in combat, which is why DOD's 2017 report to the commission flags concerns held by some that conscripted women would have a lower chance of survival if forced to serve in direct ground combat roles. So these are all reasons that I'll say these important issues. And then if we turn to those administrative costs and burdens that the court's allowed to consider in this area, if there is, in fact, a lower yield from an average taken-off-the-street pool of young women as opposed to a taken-off-the-street pool of young men of combat-ready soldiers, that would make it more difficult to allocate training resources effectively and efficiently, which is something that Rostker specifically looks at. So you can think of it in terms of they would need more boot camps, they would need more trainers, just because your yield is lower, so you have to start with a larger pool. In addition, conscripting equal numbers of women would dramatically change the gender balances in the forces right now. Right now, since 2016, all combat positions are open to women, but they are not filled in equal measure by men and women. Whereas if we had a draft that all of a sudden had an influx of women and changed those percentages, there are a number of just sort of ticky-tack things that would have to change. So this is sort of prosaic, but if you look at equipment sizing and supply are two of the things mentioned in the record, right? So if you have a small number of women in combat, you might have a small number of combat-style equipment that are tailored to women and to their specific size and strength levels. If you all of a sudden have an influx of women to create parity, you need a huge number of additional sets of equipment sized to women. Similarly, there can be issues in lodging, issues with respect to bathing facilities. All of these are reasons why when the military first integrated women into the military more broadly and also into combat more specifically, a multi-year implementation plan was envisioned. That's very different than the timeline you see for a draft, for conscription. In a conscription context, you're looking at a matter of days, right? The DOJ report talks about in terms of how many people can we raise in 100 days. And as I said, Rosker says that you can take these things into account. Going back to the sort of Rosker point, two other cases I would turn the court to are just Justice O'Connor's, who was the author of State Oil's dissent in Roper, and also Judge Stahl's opinion in Elgin. Judge Stahl in Elgin, it's sort of an intermediate point in terms of changed circumstances. So Elgin is the same challenge brought here. Most of the court resolves the case on procedural grounds that are not relevant to us. But Judge Stahl reaches the equal protection claim. This is in 2011, when women are allowed in some combat positions, submarines for example, but are not allowed in all combat positions. And what Judge Stahl says is, look, there's been a dramatic change of circumstances here, but quote, it would not be for this court to determine what if any impact these developments had on the continued viability, excuse me, vitality of Rosker. That's a task left solely to the Supreme Court. Everything you've said here in this university law school's moot court would have been wonderful. But you just hit the question, isn't the Supreme Court the only one that can reverse its prior judgments? That's right, Your Honor. That's why we think that Rosker controls, and that should really be the end of this case. Well, all of this other is interesting, but we'll see what counsel opposite says about the Supreme Court having exclusive the right to reverse itself. Thank you, Your Honor. Then maybe I'll reserve the rest of my time for rebuttal. Thank you. Okay. Thank you. You've preserved your time. All right. Please sit. Angelucci? Good morning. May it please the court, I am Mark Angelucci, counsel for National Coalition for Men, James Lesmeister, and Anthony Davis. I would like to first begin by discussing this theredecesis issue because, Your Honor, you just raised it now, so I think it's on point. That is simply not true, what's being argued here. It is true that only the Supreme Court can reverse its own decision. But as some federal courts have already explained, there's a difference between following a decision and following a precedent and extending a precedent when new circumstances have changed that are significant. In this case, the ban on women in combat has been completely lifted, and that was the primary, if not the sole, basis on which roster was decided. But that doesn't free us to engage in anticipatory overruling, does it? It's not anticipatory. It's looking at the ruling. It's still applying roster, but under the new circumstances. It's not changing roster. Roster is still alive and well. In a circumstance where women are not allowed in combat, then there's a basis under heightened scrutiny. I think the Supreme Court has made clear that even if the underpinnings of a case have been undermined, so even if the foundations have become what the court has called wobbly or moth-eaten, we're still bound to follow it, are we not? I don't agree. And one of the cases I would refer to is one that's in fact cited by the Selective Service, and that's Agostini v. Felton, 521 U.S. 203. In that case, the City of New York was sending, and I'll be very brief in the facts, but the City of New York was sending public school teachers to teach in parochial schools. Some taxpayers filed a taxpayer lawsuit to challenge it under the Establishment Clause. The trial court sided with the school board. The Court of Appeal reversed, and the Supreme Court upheld that reversal. And so there was a... No, I'm sorry. Yes, it sided with the school board, and then the Supreme Court upheld the reversal. So there was an injunction on the school board from doing that. So the school board changed and started having these teachers teach parochial lessons within the public schools instead. Then the school board sought relief from the injunction. The district court sided against the school board, and it went up to the Supreme Court, and it was reversed. And the Supreme Court stated, and I quote, in Rufo v. Inmates of Suffolk County Jail, we held that it is appropriate to grant a Rule 60b-5 motion when the party seeking relief from an injunction or consent decree can show a significant change in either factual conditions or in law. A court may recognize subsequent changes. And it goes on to describe how courts can, in fact, do that. If there are And in fact, another case recently in New Jersey held the exact same thing. That was the Kyle Lebel case, where a woman, and I cited it in my brief, where a woman is challenging the Selective Service, claiming that it discriminates against her because she wants to register. And they made the same argument that only the Supreme Court can reverse itself. And that court stated no. And the exact language said there's a difference between following a precedent and extending it. So they said we're just simply, they refused to throw the case out when the Selective Service filed a motion to dismiss. And they say there's a whole completely different set of circumstances here. What the Selective Service is essentially arguing here is that when circumstances change so much that a Supreme Court decision no longer applies because the factual circumstances are so different, a person would have to wait years and years in order to get any kind of civil rights relief because they have to wind their way all the way up to the Supreme Court. And that would just be a very bad public policy to begin with. And it is not what the cases say that they're citing. State oil does not stand for that position. In fact, state oil says, but stare decisis is not an inexorable command. In the area of antitrust law, there's a competing interest well represented in this court's decisions in recognizing and adopting the changed circumstances. It's none of the cases that they cite are stating that under changed circumstances, lower courts cannot make a Supreme Court help. That's just not true. And I will leave it at that and move on to the issue of deference. Council has, of course, made an argument for deference and a plea for deference. The district court in this case made a sound decision that they have provided no evidence to support deference. They've provided nothing to defer to. The only expert statement or anything of substance in this case presented to support their position is that of the Pentagon report, which sides completely on the side of the plaintiffs in this case and says emphatically that we ought to be including women in the draft. And it looks at all the different issues that they're raising, like administrative costs and things like that. And it also talks about how this creates both the perception and reality of unfairness in that it flat out discriminates against men. It's sex discrimination that's subject to heightened scrutiny. It's not just a mirage we're talking about here. There are stiff penalties for failure to register. And we know that those penalties, there's five years in jail, $10,000 fine, denial of federal benefits. We know they've been applied to men. In the Elgin case, a homeless man who had forgotten to register turned his life around later and many, many years later was fired from his federal job because he hadn't registered when he was young. These are the kinds, and there's other cases similar. In fact, there were several cases. If we were to put Rostker aside and get into the determination of what level of deference is required, what measure of judicial scrutiny is appropriate, I know you argue for something heightened because it's sex-based discrimination, as you say, and not rational basis, as the government prefers. But hypothetically, if we were to go the rational basis route, what does that look like in real-world practice? What does that look like in terms of how a judge would pat down the proper reasons the government gives? How meaningful scrutiny is that? Well, given that they're only reasons in the past, and I don't mean just in the Rostker decision, the district court in this case looked at the congressional record and said the primary concern of Congress when they excluded a woman from the draft was that women were banned from combat. And that the issues the council is raising about capacities and things like that were discussed only in passing and very minimally. So they have not met their burden of providing evidence to support the arguments that they're making. But is rational basis in the military setting any more meaningful or rigorous than rational basis, say, in the economic regulatory setting, which is kind of a judicial shrug, basically? I don't know that it would make a difference between the military and perhaps the private sector. But the case law is very clear that sex discrimination, even in the military, goes by heightened scrutiny, intermediate scrutiny. In the case of US versus Virginia, it says that that intermediate scrutiny, in order to meet that, you have to show an exceedingly persuasive justification for the discrimination. It can't be just persuasive on its own. It has to be exceedingly persuasive. I would analogize that to the clear and convincing standards that a lot of courts apply. It's a very strong standard. And they've come nowhere near meeting that standard as the district court held. They haven't shown any basis at all. Women are now allowed in combat. We're not here to debate the issue of whether women should or shouldn't. The Department of Defense has decided that they are. So that barrier is gone. And there's no more justification, I would argue, even on a rational basis, for excluding women from the draft. If there's going to be a draft and both men and women are allowed in all combat roles, there's no further justification. And the Pentagon has said that very clearly in its 37-page report, the only substantive expert document that we have. We have nothing else other than arguments from record, many of them. There's nothing else that solidly looks at this issue but the Pentagon report. If we're going to have deference, who else should we be deferring to except the Pentagon and the Department of Defense? I don't agree it should be a bunch of lawyers in Congress. It should be the Pentagon. And they have spoken very loudly and clearly. I've submitted that report to the court. I think I would encourage the court, I'm sure you have read it, but I would encourage the court to read it again. I assume if the commission report due March 25th were to come out forcefully in favor of making the draft applicable to women as well, that you would still press on full speed with your litigation. That doesn't offer you any kind of relief. You would still full speed ahead with your current litigation. I would. I would. Because the cases like Orr versus Village of Willowbrook are Supreme Court cases that have held emphatically that discrimination by itself causes harm. That discrimination by itself carries the baggage of sexual stereotypes, sex discrimination in particular, and causes non-economic harm to those people that are discriminated against. We know right now that at least 40 states tie selective service registration to driver's license. About 31 of them tie it to school loans, student loans, or to employment. Eight states flat out deny men the right to apply at a state college if they're not registered for the draft. I've had, and we know that since, and I've submitted this to the court, since 1993 over a million men have requested formal copies of their draft status. And that's the first step taken when you're appealing a denial of benefits. So we're talking about a very large number of men who are directly affected by this, not just ones in the case law like Elgin. So this is very serious. And putting aside those kind of economic damages, there is the stereotype that's being spread. And every time we take, make a young man who turns 18, like James Lesmeister, or like Anthony Davis, and tell them you, but not your sister, or not your female friends, some of whom are just as strong as you, and are involved in professional sports, you have to register your body as an on-call warrior for the state. We're telling them that they as males are disposable. And that male disposability is a stereotype that needs to be fought. Men to this day still don't speak out about their discrimination against them in many other areas, like child custody, and paternity, and criminal sentencing, and many other type of things, services in domestic violence programs. I've had to take on many of these type of cases because it's rampant. We know not only that men get higher sentences for the same crime when all other factors are the same, including number of priors and family situation, but drunk drivers get higher sentences when they kill a woman than when they kill a man. And these are things that are documented, but hardly talked about in academia or in government. And I know that's going beyond the scope of this case, but it's part of what the Supreme Court talks about by sexual stereotypes. We are sending a message, we're conditioning people to accept sex discrimination when it's against men. And that's why we hardly hear about these kind of things, and people who dare to speak up about it are called names, like misogynist, or things like that, when all they're really asking for is equal rights. I would point out another thing, Your Honor. Even though the decision here, the standard of review is de novo, I would point out that the district court in this case did also make a number of factual findings that would fall under the clearly erroneous standard. One of them is that men and women are similarly situated with regard to the selective service. That is a factual finding. And others are that the selective service has provided no evidence to meet its burden of showing, for example, that women are less likely to enlist, that there would be less female enlistment, or that there would be some major trade-off if women are required to register for the draft. The district court also found that the decisions Congress made long ago about dependency and physical standards and hardship were not a studied choice. That's a factual finding. The district court found that Congress's biggest concern was women being banned from combat, and that's why they excluded women. Also, that Congress has been debating this issue since 1980 with no definite end in sight. Those are the words of the district court. Those are, I would argue, factual findings that go by a clearly erroneous standard. And as the court in U.S. v. Virginia said, a clearly erroneous standard, in order to be met, the error has to be so strong that it strikes the court like a five-week-old dead, unrefrigerated fish. It's a very strong standard that has to be very clearly erroneous. And in this case, I don't think any of those findings, I think they're actually very good findings, and the district court made a very Finally, we are talking here about both rights and responsibilities. We have opened the door and given women the right to all combat roles, but coming with that is the responsibility to register if there is a draft. We take no position on whether there should or shouldn't be. Our position is that if there is one, and women are allowed in all combat roles, then there's no excuse for sex discrimination against men. So I would urge the court to uphold the district court's decision. Thank you. All right. Thank you, sir. Okay, when you started, I interrupted you by putting you to roster right away, and you principally responded to me that one of the justifications for the court's holdings may have changed, but the holding had not. So I ask you on rebuttal. Let me quick re-read Oscar up here at the bench. The claim was a due process challenge under the Fifth Amendment, not an equal protection challenge. So having heard what you said about the justification, my question is, because specifically framed in it was a Fifth Amendment due process argument for unconstitutionality and not the Fifth Amendment equal protection. Does that matter? No, Your Honor. The equal protection clause doesn't apply against the federal government, and so under the sort of reverse incorporation theory of Bowling v. Sharp, both in Rostker and in this case, the Fifth Amendment due process clause was used to bring in claims sounding in equal protection. There's a footnote to that effect in Rostker. Right. And I only ask it because many of the cases cited, as you well know, in terms of the gender piece derive or flow up from the equal protection jurisprudence, et cetera. And I just wanted to hear your response. No, that's true. But certainly all of the military cases, with the exception of VMI, which I'll deal with in a second, with the exception of VMI, all of those military cases are cases about the federal government. So in all of those cases, it's an equal protection-like brought through the Fifth Amendment due process clause. I think that's on all fours here. Sorry to jump in. What would the application of rational basis review look like? I mean, in the economic realm, it's a giant anvil on the scale, very easy for government to meet its burden. What does it look like in the military realm? So we think it looks very much like this. Now, obviously, the court did not want to call this rational basis, but when you look at those administrative burdens, how close does your tailoring have to be? It doesn't look, we think, a lot different than what happened in Roscoe or than what we're urging. So long as there is any conceivable, theoretical, hypothetical justification for the government's decision. And even if the government itself doesn't tee those up and assert them, judges are free themselves to sort of come up with on their own additional justifications they might find persuasive. The only sort of there is just in that Schlesinger formulation, it says, you look to what Congress may quite rationally have believed. So there is a sort of rationality requirement there, which is obviously in rational basis too. And there could be some evaluation of reasons under that thought. Now, in Roscoe, they are looking to what Congress said. I just want to maybe clear up one point, which is that the question of sort of like, who else do we defer to if we're not deferring to the Pentagon? In this case, we are not deferring to the Pentagon. We are not deferring to the military. We are not deferring to the president. We are deferring to Congress. That's footnote 15 of Roscoe. If we were to apply, again, Roscoe aside, if we were to apply a heightened, more muscular kind of judicial pat-down of all this, how does the government win? So if you were to apply full-fledged intermediate scrutiny, like Craig Reborn-style intermediate scrutiny, then I think we win because what you should be looking at is the record that Congress has created. And that's what Roscoe did, right? In 1980. The vintage of that record. Well, what I was going to say is in 1980, Congress creates a new record because there have been changed circumstances, and Roscoe evaluates that record. That record is being created right now. So that's the commission's report and Congress's reaction to it. And it's not really fair to hold Congress to what its justifications are when it's in the process of creating its record. Just a couple of quick points kind of in response. In Agostini, the Supreme Court, the trial court acted within its discretion in entertaining the motion, supporting allegations. But it was also correct to recognize that the motion had to be denied unless and until this court reinterpreted the binding precedent. Similarly, in state oil, the language cited by my friend goes to whether the Supreme Court itself should apply stare decisis, whether lower courts should. In United States versus Virginia, I think it's important to distinguish that case because that's a state law case. So the Virginia Military Institute is a state institution. It was male only under state law. So there's no Congress to defer to there. It's not a case where under Article I, Section 8, Congress has made some sort of judgment in support of its power to raise armies. Let me ask you, one of the cases cited to it, or at least came up, counsel I've said may have, it was the Elizabeth Kyle Lavelle case, the female who challenged this in March of 2019. And the government on the other side filed a motion to dismiss a 1286 in the district court, allowed the claim holding that she stated a claim. And it was similar arguments in terms of due process, equal protection, etc., etc. Do you know the status of that case? Was it appealed to the Third Circuit? Is it in the pipeline? As you say, a motion to dismiss was denied, but no summary judgment motions have been filed because they're currently doing classification. It's still in the district court and will be for some time. Just one final point if I may. I think the district court would have been surprised to hear that it was making factual findings in the context of resolving a motion for summary judgment where all facts have to be undisputed. Obviously, it would be a reversible error to be making factual findings in that context, but the district court's not going to be doing that. Thank you. Okay. Thank you. All right. Thank you, counsel, for both sides. Obviously, a very interesting case, to put it mildly. Thank you for the briefing. I think it was amicus, one or more amicus briefs filed, and good arguments on both sides. Obviously, you're both very knowledgeable on what's going on in the whole landscape of things, so we will take the cases submitted along with the other cases that were orally argued. We do have some other cases that were non-orally argued, but all those will be submitted to us. So this phase of this panel, with me in it, that ends our cases, and so the panel reconstituting will resume tomorrow, but this panel stands adjourned. Thank you.